# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **JEFF HATCHER, Individually** | § | |
| **And MICHELLE HANSFORD,** | § | |
| **Individually, and as the lawful heirs** | § | |
| **of the ESTATE OF** | § | |
| **JORDAN ROSS HATCHER** | § | **CIVIL ACTION NO. 3:14-CV-00432-M** |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **WESLEY BEMENT** | § | |
| *Defendant.* | § | |

## <u>PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Respectfully submitted,

By: _____

Darren Wolf
Texas Bar No.  24072430
Darren@darrenwolf.com
Christianne Edlund
Texas Bar No. 24072083
christianne@darrenwolf.com
Law Office of Darren Wolf, P.C.
1701 North Market Street, Suite 210
Dallas, Texas  75202
Phone (214) 346-5355
Fax. (214) 346-5909
*Attorney for Plaintiffs*

## TABLE OF CONTENTS

I. SUMMARY.................................................................................................................. 4

II. FACTS ..................................................................................................................... 5

    A.   The Taser ......................................................................................................... 6
    B.   Hatcher's Actions ............................................................................................ 9
    C.   Prior Warnings .............................................................................................. 11
    D.   Reaction of other Officers ............................................................................ 12

III.   ARGUMENTS AND AUTHORITIES .................................................................. 13

    A.   Summary Judgment Standard in Qualified-Immunity Cases ................................. 13
    B.   Qualified Immunity Standard .............................................................................. 14
    C.   Summary Judgment should be denied because Officer Bement's use of deadly force was not reasonable and thus Bement violated Hatcher's clearly-established constitutional right.................................................................................................. 17

        i.       Possession of Taser ................................................................... 17
        ii.      Hatcher's actions immediately before being shot ..................... 18
        iii.     No prior warning given to Hatcher ........................................... 19

    D.   Summary Judgment should be denied because an objectively reasonable officer Would have known his or her alleged conduct violated the law. ........................... 20

IV.   CONCLUSION ....................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*Batiste v. City of Beaumont,* 421 F.Supp.2d 969, 979 (E.D. Tex. 2005 ....................................... 14

*Bazan v. Hidalgo County*, 246 F.3d 481, 492 (5th Cir. 2001). ........................................ 13, 14, 17

*Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011). ................................................. 15

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). ................................................................... 13

*Cole v. Hunter,* 68 F. Supp. 3d 628 (N.D. Tex. 2014)............................................................ 14, 19

*Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006)................................................... 13

*Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. Tex. 2004). ...................................... 4, 14

*Gooden v. Howard County, Md*., 954 F.2d 960, 971 (4th Cir. 1992). .................................... 14, 17

*Graham v. Connor*, 490 U.S. 386,396-97 (1989) ......................................................................... 15

*Harris v. Serpas*, 2014 U.S. App. LEXIS 4643 (5th Cir. 2014) ..................................... 15, 19, 22

*Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007). ........................................................... 13

*Lytle v. Bexar County Tex.*, 560 F.3d 404, 410 (5th Cir. Tex. 2009); ........................................ 15

*Mississippi State Employment Servs.,* 41 F.3d 991, 995 (5th Cir. 1995)..................................... 14

*Reyes v. Bridgwater*, 362 F. App'x 403, 408 (5th Cir. 2010). .................................................... 15

*Saucier v. Katz*, 533 U.S. 194, 201(U.S. 2001). ................................................................... 15, 20

*Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)....................... 14, 15

*Thompson v. Mercer,* 762 F.3d 433, 440 (5th Cir. Tex. 2014). .................................................. 16

*Tolan v. Cotton*, 713 F.3d 299, 306-307 (5th Cir. Tex. 2013)................................................ 4, 14

*Tolan v. Cotton*, 713 F.3d 299, 306-307 (5th Cir. Tex. 2013)...................................................... 4

**Statutes**

Fed. R. CIV. P. 56(c) ……………………………………………………………………………13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JEFF HATCHER, Individually** | § | |
| **And MICHELLE HANSFORD,** | § | |
| **Individually, and as the lawful heirs** | § | |
| **of the ESTATE OF** | § | |
| **JORDAN ROSS HATCHER** | § | **CIVIL ACTION NO. 3:14-CV-00432-M** |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **WESLEY BEMENT** | § | |
| *Defendant.* | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs file this Response to Defendant's Motion for Summary Judgment, and respectfully show the Court as follows:

### I.   SUMMARY

1.      Bement's Motion for Summary Judgment based on his qualified-immunity defense should be denied because there are genuine issues of material fact as to whether the Bement's use of deadly force was objectively reasonable under clearly established law.

2.      When asserting qualified immunity in a summary-judgment motion, summary judgment should be denied if there is a genuine question of material fact as to whether or not the police officer reasonably believed that the suspect posed an immediate and significant threat to anyone.[1]  Summary judgment is not proper if the nonmovant can point to evidence that contradicts the moving party's version of events.[2]

3.      The evidence presented by Plaintiffs and in Defendant Wesley Bement's own summary-judgment motion show contradictory facts about what actually happened at the moment of threat before decedent Jordan Hatcher's ("Hatcher") death and raises many genuine issues of material facts as to whether Bement reasonably believed that Hatcher posed an immediate and significant threat to himself or the other officers at the scene. (It should be noted that in this Court's Order dated February 19, 2015, the Court stated that it

---

[1] *Flores v. City of Palacios*, 381 F.3d 391, 399, 2004 U.S. App. LEXIS 16477, *19 (5th Cir. Tex. 2004).
[2] *Tolan v. Cotton*, 713 F.3d 299, 306-307 (5th Cir. Tex. 2013).

would consider only the qualified immunity arguments set forth in Sections I, II, III, IV(B), and VI of Bement's Motion, thus, Plaintiffs response below focuses primarily on those sections in their response. Additionally within 24 hours of filing this Response, Plaintiffs are filing a Motion for Leave to Amend their Complaint to address the newly-discovered evidence set forth in this response).

4.      Specifically, contrary to Bement's story, Plaintiffs assert that 1. Hatcher never took control of Bement's taser; 2. Hatcher was displaying no threatening "Manis act" before he was shot and was instead bent over, wiping his eyes, and walking away from the police officers; and 3.  Bement gave Hatcher no warnings to drop the taser or any other warning that Bement intended to shoot Hatcher.   Further, all five officers on the scene that were in the same situation as Bement chose to engage in non-lethal force.  Bement was the only officer to unholster his gun, point it at Hatcher, and shoot him four times in the chest.

5.      Accordingly, Bement is not entitled to qualified immunity.

## II.    FACTS

6.      The events leading up to Hatcher's death started when a Target employee notified police that he suspected Hatcher of shoplifting a Wii-remote worth $49.95.[3]   After a brief struggle with Grand Prairie Police Officer Sharp outside of Target, Hatcher fled on foot and was ultimately surrounded by six police officers in a Tarrant County Community College parking lot.[4]

7.      Hatcher was wearing long shorts and no shirt.[5]  While at one point dispatch advised that Hatcher may have had a knife, Hatcher never presented a knife <u>at any time</u> during entire incident that day, nor was a knife recovered from Hatcher's body.[6]  No officer or witness, including Bement, ever reported that Hatcher actually possessed a knife at any time during the entire incident.[7]

8.      The factual circumstances present immediately before and during the shooting are highly contested in this action.   Bement contends that after attempting to fire his Taser at Hatcher, which was ineffective

---

[3] Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 23 ("I observed Mr. Hatcher conceal a Wii Remote controller valued at $49.99").
[4] *Id.* at Apx. p. 24.
[5] Pls' Exhibit A., Apx. p. 1.
[6] Pls' Exhibit B., Apx. p. 18-25.
[7] *See generally* Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. Pp. 1-51.

because only one probe struck Hatcher, Bement attempted to deliver a drive stun to Hatcher's body, and Hatcher was able to overpower and take the taser away from Bement.[8]  Bement argues that around the same time, TCC Officer Denson sprayed Hatcher with pepper spray, but Hatcher was unaffected[9].  Bement states in his affidavit that he drew his pistol when Hatcher began moving toward Officer Denson while pointing the Taser at her.[10]  As Officer Denson was backing away from Hatcher, Offer Bement contends that he shouted "Stop", but Hatcher instead began *attacking* Officer Denson, and he was in fear that Hatcher would injure Officer Denson and take her firearm.[11]  Bement then contends that Hatcher began moving toward Officer Denson, and Hatcher quickly turned toward Bement and pointed the taser at Bement.[12]  Claiming to be in fear for his life, Bement shot Hatcher four times, at which point Hatcher allegedly dropped the Taser and fell to the ground.[13]

9.      As detailed below, none of the other five officers surrounding Hatcher, nor do any of the disinterested civilian witnesses recount Bement's version of events.

**A.      The Taser**

10.      First, it is highly questionable that Hatcher ever took control of Bement's Taser.  Officer Denson, who was "so close I could see the blood coming out of the wound in [Hatcher's] chest" and says that "immediately before being shot Hatcher was wiping away the [pepper-spray] residue from his eyes", says she was never in a position to see Hatcher grab the taser from Bement.[14]  If Bement's story that Hatcher was moving toward Officer Denson, pointing the taser at her and *attacking* her as she backed away were true, then surely Officer Denson would have *seen* the taser in Hatcher's hand before Bement shot him.

---

[8] Pls' Exhibit A., Apx. p. 1-2.
[9] *Compare Id* to Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 46 ¶ 25. (It should be noted that in Bement's original affidavit taken four days after the shooting, he never stated that Hatcher was not affected by pepper spray – this statement was only added in his most recent, modified, affidavit used for purposes of his motion for summary judgment.)
[10] Pls' Exhibit A., Apx. p. 2.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 19 – 20.

11.     Further, several disinterested, civilian witnesses state not seeing a taser or any other weapon in

Hatcher's hands:

**Melinda Craig (Civilian witness who was two parking rows away from the shooting[15]):**

**MR. VANSTENBURG**:  In all of these things up to this point, did you ever see anything in the hands of the Caucasian male with the shorts on?

**MS. CRAIG**:  Huh-uh.

**MR. VANSTENBURG**:  Never saw anything in his hands.  Okay.[16]

---------

**MS. CRAIG**:  -- and that's why I didn't see that moment of the pop, pop, pop because I only saw the yellow [pepper spray] -- him bent over and then -- he's not in this position. He's more like in this.  They're trying to do it and he's -- he's down in this position.

**MR. VANSTENBURG**:  Uh-huh.

**MS. CRAIG**:  So his arms are closer to his pants.  I think at that point I saw his hands, though.

**MR. VANSTENBURG**:  Okay.

**MS. CRAIG**:  I think they're empty.

**MR. VANSTENBURG**:  There was not anything in his hands?

**MS. CRAIG**:  I think so.

**MR. VANSTENBURG**:  Okay.

**MS. CRAIG**:  Because he's bent over and his hands are coming up.  I don't remember there being anything in the hands, but --[17].

**Sonny Garrett (50 yards away and unobstructed view from shooting[18]):**

**MR. GARRETT**:  I saw -- I heard the shots and -- I heard four shots and then he fell to the ground.  The suspect fell.

**THE OFFICER**:  Okay.  Did -- while they were grappling, did you ever see him go after any weapons that you could see?

**MR. GARRETT**:  No.  That's -- I couldn't see him going for anything.  I think he was just riled up from the pepper spray and stuff.

**THE OFFICER**:  Are you saying you couldn't see it because of the way they were moving around or -- or he didn't do it?

**MR. GARRETT**:  I didn't -- I did not notice him go for a weapon.

---

[15] Pls' Exhibit B., Apx. p. 5, Transcript p. 12, lines 16 – 21.
[16] Pls' Exhibit B., Apx. p. , Transcript p. 12, lines 16 – 21.
[17] *Id*. at Appx p. 7-8, Transcript p. 16 line 25 – p 17 line 16.
[18] *Id*. at Appx P. 11,  Transcript p.8 lines 17-20.

**THE OFFICER**:  Okay.  And so at this time when the shots are fired, are you still watching the whole incident?

**MR. GARRETT**:  Yes.

**THE OFFICER**:  And he -- and it's still 50 yards away unobstructed at that point?[19]

**Macario Villanueva (unknown distance):**

**MR. LEE**:  Okay.

**MR. VILLANUEVA**:  And --

**MR. LEE**:  And were you looking when the shots rang out?

**MR. VILLANUEVA**:  Yes.

**MR. LEE**:  Okay.  What did you see?

**MR. VILLANUEVA**:  I just saw the -- I just saw the struggle going on.  I believe that he still had the leads in him and he probably pulled on them.  They were attached to a taser and then the shots rang out and –

**MR. LEE**:  Did you see an officer with his hand raised firing the shots?  Did you see that?

**MR. VILLANUEVA**:  I saw a gun raised and I didn't -- I -- I -- I -- it happened so quick I just didn't -- I just thought okay, you know, that's the fire.  The shots fired so quick I just -- I didn't believe that the -- the -- I didn't think that the -- I didn't think those were gun shots.[20]

12.     Additionally, Officer Jeffries asserts in his affidavit that Hatcher was holding the taser in his right hand[21] but the Arlington Incident Report created after the shooting shows that if Hatcher did hold a taser, it would have been in his left hand.[22]  Bement stated that Hatcher dropped the taser after Bement shot him[23], and according to the Arlington Investigative report, appears to have landed approximately four fee away from Hatcher's left hand.[24]

13.     Thus, the evidence calls into a major question of fact as to whether or not Hatcher was even holding Bement's taser, before Bement shot him.

**B.     Hatcher's Actions.**

---

[19] *Id.*

[20] Pls' Exhibit C. at appx P.30,  Transcript p. 6 lines 2-11.

[21] Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 6.

[22] Pls' Exhibit B., Apx. p. 18-25.

[23] Pls' Exhibit A., Apx. P. 2.

[24] Pls' Exhibit B., Apx. p. 18-25.

14.     There is also a major question of fact as to what Hatcher was doing immediately before he was shot.   Bement argues that after point the taser at Officer Denson while moving toward her, and then *attacking* her, Hatcher turned toward Bement with the taser at which point Bement shot him.[25]   None of the other officers surrounding Hatcher, including Officer Denson herself, stated that Hatcher was attacking Officer Denson with the taser.[26]   Further, Officer Denson's statements, along with two disinterested witness statements directly contradict Bement's version of the events:

**Officer Denson**:

"I know the pepper spray hit the suspect in his face as I was only 3 feet away when I sprayed him and I could see it on his face around his eyes and nose. The suspect closed his eyes momentarily. Then Sgt. Jefferies sprayed the suspect with his pepper spray.   The suspect then tried to walk slowly away from all of us. It appeared like he was squinting and had his head down and was attempting to wipe away the residue from his eyes. I was about to spray the suspect again when all the sudden, without any warning, or notice, a heard a gunshot come from my right and saw the suspect get hit in his upper left side.[27]

**Melinda Craig**:

MS. CRAIG:   -- or something.   They're over there and I go maybe I need to drive away.   And then I turn around and there's yellow foam that they're spraying on this guy's head --

MR. VANSTENBURG:   Okay.

MS. CRAIG:   -- all over him.   There's like three to five.   I mean, there's a bunch of them, all of them.

MR. VANSTENBURG:   Okay.

MS. CRAIG:   And I see the guy bend over.   He bends over.   He's turning this direction now.   But they're spraying it and he's bent over and he starts to turn this way and I look back over to my son and at that point I hear pop, pop, pop, pop, pop.   I go I wonder if that's a gun.

MR. VANSTENBURG:   Uh-huh.

MS. CRAIG:   And I turn back and he's laying on the ground and I see him convulse like twice.[28]

**Macario Villanueva**:

MR. VILLANUEVA:   I just saw the -- I just saw the struggle going on.   I believe that he still had the leads in him and he probably pulled on them.   They were attached to a taser and then the shots rang out and --[29]

---

[25] Pls' Exhibit A., Apx. P. 2.
[26] *See generally* Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. pp. 1-51.
[27] *Id.* at p. 19.
[28] Pls' Exhibit B., Apx. p. 7, Transcript p. 14 line 20 – p. 15 line 11.
[29] Pls' Exhibit D., Apx. p.30, Transcript p. 6

15.   Moreover, as far as Hatcher's demeanor, many of the witnesses stated that Hatcher was not taking an aggressive stance with the officers but merely trying to flee:

**Richard Leppert (Security officer at Target):**

**MR. HENSON**:   Okay.   When you're saying --when you say struggle --

**MR. LEPPERT**:   Uh-huh.

**MR. HENSON**:   -- exactly -- you had also stated that he was pushing --

**MR. LEPPERT**:   Uh-huh.

**MR. HENSON**:   -- and shoving.

**MR. LEPPERT**:   Uh-huh.

**MR. HENSON**:   He never swung at you.

**MR. LEPPERT**:   So I -- I deal with a lot of people when I'm making apprehensions.   Most of them comply with me.   Never once have I had somebody that has tried to stand toe to toe with me and want to duke it out.

**MR. HENSON**:   Uh-huh.

**MR. LEPPERT**:   It's been my experience that most people are simply trying to get away from me.

**MR. HENSON**:   Yeah.

**MR. LEPPERT**:   That is -- the guy, Mr. Hatcher, appeared to be very strong.   I think that if he wanted to he could have inflicted pain on me --

**MR. HENSON**:   Uh-huh.

**MR. LEPPERT**:   -- simply by striking me and he wasn't doing that.   He was pushing my arms away and – and yet he was shoving me and whatnot trying to get me off of him.

**MR. HENSON**:   Okay.

**MR. LEPPERT**:   But I feel like he was doing that in an effort to get away.

**MR. HENSON**:   Okay.

**MR. LEPPERT**:   I don't think that he was being on the offensive to injure me.

**MR. HENSON**:   Okay.

**MR. LEPPERT**:   And he -- he stole one controller.   On yesterday's date, he had one controller . . .[30]

**Sonny Garret:**

**MR. GARRETT**:   And I heard them say get on the ground like two more times and at this point he was resisting.

**THE OFFICER**:   How was he doing that?

---

[30] Pls' Exhibit B., at p. 15-16, Transcript p. 12, line 2 – p. 13, line 10.

**MR. GARRETT**:  He was, you know, kind of like trying to stay away from them, trying to avoid everything and they all -- and then I realized that one of the officers had a taser pulled.[31]

**<u>Melinda Craig</u>:**

**MS. CRAIG**:  I only have -- his behavior is that he was very strong and he didn't respond to anything that was happening.

**MR. VANSTENBURG**:  Okay.

**MS. CRAIG**:  He's just strong standing there.[32]

16.     Accordingly there are major questions of fact regarding Hatcher's actions and demeanor immediately prior to being shot.

## C.     Prior Warnings

17.     There is also a question of fact as to whether or not Hatcher was given any warnings to either drop the taser or that he was about to be shot.  According to Bement's statement in his original affidavit taken only four days after he shot Hatcher, the only command he gave between the time he alleges Hatcher took control of the taser and the time he shot Hatcher was one command to "Stop."[33]  Not until two years later did Bement modify his affidavit to add that "While I do not remember my exact words, I gave Hatcher commands to stop doing what he was doing."[34]

18.     Further, Officer Denson stated that absolutely no warnings at all were given before Hatcher was shot:

> The suspect then tried to walk slowly away from all of us. It appeared like he was squinting and had his head down and was attempting to wipe away the residue from his eyes. <u>I was about to spray the suspect again when all the sudden, without any warning, or notice, a heard a gunshot</u> come from my right and saw the suspect get hit in his upper left side. . . . It startled me so much that I started backing up. . . . While I was backing up I heard two more shots being fired and I was thinking "Why is he still shooting?" as I was so close to the suspect. I was worried about getting shot. I backed up so quickly that I lost my balance and fell backwards to the ground.[35]

---

[31] *Id.*  at p. 11, Transcript p. p. 5, line 19 – 24.

[32] *Id.*  at p 8, Transcript p. 17 line 23 – 18 line 3.

[33] Pls' Exhibit A., Apx. p. 2 ("The female officer was backing up away from the suspect, and I shouted for the suspect to "Stop!") Not until over two years later, on February 18, 2015 did Bement add to his new affdidavit used for purposes of his Motion for Summary Judgment that he though he might have said more.  Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 45, ¶ 28 ("While I do not remember my exact words, I gave Hatcher commands to stop doing what he was doing.").

[34] Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p 45.

[35] *Id.* at Apx. p. 19.

19.     Thus, there is a genuine issue of material fact as to whether or not Hatcher was given any warning to drop the taser or that he was going to be shot with a gun, before Bement shot him four times.

**D.     Reaction of other Officers**

20.     Perhaps most revealing that there are major questions of fact in Bement's version of events leading to his shooting Hatcher is the fact that not even one of the five other officers on the scene with Bement perceived a "moment of threat" that required deadly force to resolve.

21.     None of the five other officers that were surrounding Hatcher and similarly situated in the same circumstances as Bement even unholstered or drew his or her gun. Officer Denson was about to spray Hatcher again with pepper spray.[36]  Officer Lechowicz had deployed his non-lethal ASP baton and "took a step toward the suspect preparing to strike him in defense of Officer Bement."[37]  Officer Clarke, who had originally had his gun out but then re-holstered it once he realized that Hatcher did not have a knife, was holding his baton in his right hand in the ready position.[38]  Officer Dorsey stated he was circling around Hatcher when he heard the gunshots.[39]

22.     Last, while Officer Jeffries had allegedly placed his hand on his gun, he had not unholstered it or pointed it at Hatcher.[40]  Sergeant Jeffries, however, had also stated that he thought he knew the taser was capable of holding another cartridge and did not know if one was in the gun, so, had Hatcher been holding the taser which is a contested fact, Officer Jeffries's perception of the threat of danger was much higher than that of Bement's, who knew the taser only contained one cartridge that had already been deployed.[41]  Further, there is a major question fact as to veracity of Officer Jeffries's account of the shooting because one disinterested civilian witness stated that Officer Jeffries wasn't even there:

**Richard Brown:**

**MR. BROWN**:  And I noticed that there was another TCCC cop car coming and I thought it was one of our other officers. It was one of our officers but it wasn't the one that I thought

---

[36] *Id.*
[37] *Id.* at Apx. p. 13.
[38] *Id.* at Apx. p. 10.
[39] *Id.* at Apx. p. 3.
[40] *Id.* at Apx. p. 7.
[41] *Id.*

it was.  I thought it was Officer Carter, but it was Officer Jeffrey.  So I told him.  I said well -- I say here come Officer Carter.  I said Carter's a big enough man.  I said Carter will flip him to the ground just like that.  Well, as I turned my attention to look at Carter's car as soon as it -- that car pulled up --

**MR. LEE**:  Carter's car was really Jeffrey's car.

**MR. BROWN**:  It really was Jeffrey's car.  And as I turned my attention to him -- well, <u>as soon as he</u> <u>parked his car, we was looking that way and then all of a sudden we heard -- I</u> <u>thought I heard three shots</u>.  And we both turned and looked at each other.  I said wow, they just shot him.  I say I'm sure they shot him.  I said that was three shots just rang out . . .[42]

23.     Thus, there is a genuine issue of material fact that Bement's use of deadly force was reasonable under the circumstances.

## III.     ARGUMENTS AND AUTHORITIES

### A.     Summary Judgment Standard in Qualified Immunity Cases.

24.     Summary judgment is proper only if "there is no genuine issue of material fact and . . . movant is entitled to judgment as a matter of law".[43] A court should resolve doubts in favor of the nonmoving party (Plaintiffs in this case) and make all reasonable inferences in favor of that party.[44] "The court must disregard all evidence favorable to movant that the jury is not required to believe, giving credence to the evidence favoring nonmovant that is uncontradicted and unimpeached, at least to the extent the evidence is from disinterested witnesses."[45]

25.     When asserting qualified immunity in a summary-judgment motion, a movant meets its burden by pleading in good faith that it is entitled to such immunity.[46] Qualified immunity being an affirmative defense, the burden shifts to nonmovant to rebut entitlement to it.[47] Summary judgment should be denied if there is a genuine question of material fact as to whether or not the police officer reasonably believed that

---

[42] Pls' Exhibit B., Apx. p. 5, Transcript p. 5, line 10 – p. 6 line 2.
[43] Fed. R. CIV. P. 56(c); *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[44] *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006).
[45] *E.g., Bazan v. Hidalgo County*, 246 F.3d 481, 492 (5th Cir. 2001).
[46] *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007).
[47] *Id.*

the suspect posted an immediate and significant threat to anyone.[48]  Summary judgment is not proper if the nonmovant can point to evidence that contradicts the moving party's version of events.[49]

26.      Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment."[50]   For example, in *Cole v. Hunter,* summary judgment on qualified immunity was denied where the officers testified that Cole pointed a loaded gun at them but the plaintiffs presented evidence suggesting that Cole never pointed a gun at the officers and instead continuously directed the gun toward his own head.[51]  As another example, in *Bazan v. Hidalgo* County the court denied summary judgment where the shooting officer was the sole surviving witness for his use of deadly force and because there were questions arising from the varied testimony as to what occurred shortly before the suspect ran into the field where he was shot.[52] The court held that such contrasting characterizations of the events leading up to the shooting could affect the outcome of the case; and were, therefore, material and raised a genuine dispute.[53]

**B.      Qualified Immunity Standard.**

27.      To overcome the qualified immunity defense, a plaintiff must assert specific facts that, if proven, would (1) demonstrate the police violated clearly established statutory or constitutional rights, and (2) show that an objectively reasonable officer would have known his alleged conduct violated the law.[54]

28.      As to the first prong of the qualified-immunity standard, "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."[55] When a Fourth

---

[48] *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. Tex. 2004).
[49] *Tolan v. Cotton*, 713 F.3d 299, 306-307 (5th Cir. Tex. 2013) ("[t]he Fifth Circuit has . . . refused to allow a nonmovant to defeat summary judgment where, as here, he or she 'points to nothing in the summary judgment record that casts doubt on the veracity of the [witness's] version of the events."). That Pailet's narrative is the only full account does not per se cast doubt on its veracity; the plaintiffs must offer or point to other evidence that contradicts or undermines his account; skepticism is insufficient. See *Ontiveros*, 564 F.3d at 383")
[50] *Bazan v. Hidalgo County*, 246 F.3d at 491; *citing Gooden v. Howard County, Md.*, 954 F.2d 960, 971 (4th Cir. 1992).
[51] *Cole v. Hunter,* 68 F. Supp. 3d 628 (N.D. Tex. 2014).
[52] *Bazan,* 246 F.3d at 491.
[53] *Id.*
[54] *Batiste v. City of Beaumont*, 421 F.Supp.2d 969, 979 (E.D. Tex. 2005); *citing Wicks v. Mississippi State Employment Servs.,* 41 F.3d 991, 995 (5th Cir. 1995).
[55] *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985).

Amendment excessive force claim involves death, there is a clear seizure and an injury resulting from deadly force such that the only issue is whether the use of deadly force was reasonable.[56] Under the second prong of the qualified-immunity test analysis, the court must ask "whether the right was clearly established at the time of the conduct."[57] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[58]

29.     It was clearly established well before Hatcher's shooting on January 24, 2013 that "deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others,'" and that the threat of serious physical harm must be "immediate,"[59] Accordingly, to be entitled to qualified immunity at the summary-judgment phase, Bement must conclusively establish that his actions were not only reasonable, but that he justifiably had probable cause to believe that Hatcher posed a threat of serious, *immediate*, physical harm to himself or others.

30.     Reasonableness of the use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight.[60] The defense of qualified immunity must be assessed in the context of "what the officer knew at the time he acted, not on facts discovered subsequently."[61]

31.     Further, in a case involving the shooting of a suspect, we have stated that the "core issue" into the question of reasonableness is "whether the officer reasonably perceived an immediate threat."[62] "[T]he focus of the inquiry is the act that led the officer to discharge his weapon."[63] Thus, "[t]he excessive force

---

[56] *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).
[57] *Lytle v. Bexar County Tex.*, 560 F.3d 404, 410 (5th Cir. Tex. 2009); *citing Saucier v. Katz*, 533 U.S. 194, 201(U.S. 2001).
[58] *Id.*; *quoting Saucier*, 533 U.S. at 202.
[59] *Garner*, 471 U.S. at 11.
[60] *Graham v. Connor*, 490 U.S. 386,396-97 (1989); *Harris v. Serpas*, 2014 U.S. App. LEXIS 4643 (5th Cir. 2014).
[61] *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. Tex. 2014).
[62] *Luna* 773 F.3d at 719; *citing Reyes v. Bridgwater*, 362 F. App'x 403, 408 (5th Cir. 2010).
[63] *Id.* at 406 (internal quotation marks and alteration omitted) (quoting *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)); see also <u>*Bazan*</u>, 246 F.3d at 493 ("The excessive force inquiry is confined to whether the Trooper was in danger at the moment of the threat that resulted in the Trooper's shooting.").

inquiry is confined to whether the [officer] was in danger <u>at the moment of the threat</u> that resulted in the [officer's] shooting."[64]  In the recently-decided *Harris v. Serpas*, the Fifth Circuit clearly established that an officer must reasonably believe there is danger at "the moment of the threat" that resulted in the shooting.[65] Thus, any actions of an officer or suspect leading up to the shooting are <u>not relevant</u> for the purposes of an excessive-force inquiry in this Circuit.[66]

32.     Instead, "regardless of what had transpired up until the shooting itself," the question is whether "the officer [had] reason to believe, at that moment, that there was a threat of physical harm." Id. at 1276.[67] Indeed, the Fifth Circuit has stated that "[w]e need not look at any other moment in time."[68]

33.     Further, the Fifth Circuit requires the suspect display a threatening "Manis act" before it is objectively reasonable to use deadly force.[69]  As explained by Northern District of Texas Judge Oconnor, the term "Manis Act" is derived from the Fifth Circuit 2009 decision *Manis v. Lawson*, where, "in examining the reasonableness of an officer's use of deadly force and finding no excessive force under the circumstances, the Court in *Manis* stated 'None of these assertions, however, bear on whether Manis, in defiance of the officers' contrary orders, reached under the seat of his vehicle and appeared to retrieve an object [the police officer] reasonably believed to be a weapon. This was the act that led [the officer] to discharge his weapon and it is undisputed. In light of Manis's undisputed actions [the officer's] use of force was not excessive.'[70]  Thus, even when a weapon is present, the suspect's actions must create a threat that is sufficiently imminent at the moment of the shooting to justify deadly force.[71] For example, encountering someone who is merely holding a gun to one's own head may not be a sufficiently threatening Manis act.[72]

---

[64]  *Harris,* 745 F.3d at 772-73;  *Bazan* 246 F.3d at 493.
[65] *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2011).
[66] *Id.*
[67] *Thompson v. Mercer*, 762 F.3d 433, 440 (5th Cir. Tex. 2014).
[68] Id.; see also Harris, 745 F.3d at 772 (explaining that "any of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit").
[69] *Cole v. Hunter*, 68 F. Supp. 3d 628 (N.D. Tex. 2014); C*iting Manis*, 585 F.3d at 845.

[70] *Cole v. Hunter,* [Doc. 85] Memorandum Opinion and Order on Def.'s 2nd Motion to Dismiss, Case 3:13-CV-02719-O (N. Dist. Texas Jan 24, 2014).
[71] *Luna* 773 F.3d at 719.
[72] *Cole* 68 F. Supp. 3d 628 (N.D. Tex. 2014).

As another example, the 5th circuit held in *Reyes v. Bridgwater* that a fact issue precluded qualified immunity where suspect was armed with a knife, but made no threatening gesture or motion, i.e. no threating "Manis Act".

**C.      Summary Judgment should be denied because Officer Bement's use of deadly force was not reasonable and thus Bement violated Hatcher's clearly-established constitutional right.**

34.      Under the first prong of the qualified-immunity analysis, Summary Judgment should be denied because Plaintiffs have identified multiple genuine issues of material fact to establish that Bement's use of deadly force against Hatcher was not reasonable under the circumstances.

i. Possession of Taser

35.      Whether or not Hatcher possessed a taser in his hand is not only controverted but is also highly material.  The main focus of Bement's justification for shooting Hatcher is based on his assertion that Hatcher was holding a taser.  Indeed, Bement spends a multitude of paragraphs in his new affidavit elaborating on the dangers of taser weapons, and indicates that Hatcher's possession of the taser is what put him in fear of his life:

> Hatcher took my Taser away from me and was holding it in his hand in a position where he could have used it in a drive stun mode; Hatcher pointed the Taser as me and other Officers; and Hatcher acted as if he was going to use my Taser on me.  Hatcher's actions made it clear that he was going to use the Taser on me. I was in fear for my lift.  I fired shots at Hatcher.[73]

36.      While Bement has great personal interest in asserting that Hatcher was in possession of the taser, other evidence from disinterested witnesses directly contradicts Bement's claim, which could drastically affect the outcome of this case[74]  Officer Denson, who was close enough to Hatcher to see blood coming out of the wound in his chest says she did not see Hatcher grab a taser from Bement, and that immediately before he was shot, he was using his hands to wipe pepper spray from his eyes.[75]  Further, at least two

---

[73] Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 45
[74] *Bazan v. Hidalgo*, 246 F.3d at 491 ("A court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses"); *citing Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151, (U.S. 2000) ("Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment."); *Gooden* 954 F.2d at 971 (4th Cir. 1992).
[75]  Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 19.

disinterested witnesses stated they did not see a taser in Hatcher's hands.  Melinda Craig stated that there was nothing in his hands and that Hatcher was bent down with his arms closer to his pants;[76] Sonny Garrett stated that, even though he was watching the entire incident, he did not notice Hatcher going for a weapon before he was shot;[77] and Macario Villanueva, who stated that he saw Bement with his hands raised and firing shots at Hatcher, did not stated that Hatcher was holding a taser, and instead stated that just saw a struggle and that he things Hatcher was pulling at taser leads that were on him when the shots rang out.[78] Further, testimony that Hatcher was holding the taser in his right hand is directly controverted by the physical evidence at the scene of the shooting in which the taser is shown laying approximately four feet away from Hatcher's *left,* hand.[79]

37.     Accordingly, when viewing the evidence in the light most favorable to Plaintiffs, it is clear that a genuine issue of material fact as to whether or not Hatcher was in possession of a taser exists.

      ii.     <u>Hatcher's Actions immediate before being shot.</u>

38.     Bement's account that Hatcher was attacking Officer Denson and Bement with the taser is highly contested.  No other officer or witness – not even Officer Denson herself – recounts that Hatcher pointed a taser at her or started attacking her.[80]  Instead, Officer Denson says that Hatcher was walking slowly away, with his head down, and wiping his eyes when Bement shot him.[81]  This recounting of the fact is corroborated by disinterested, civilian witnesses, Melinda Craig, who says that Hatcher was bent over with his arms near his pants and his hands are coming up toward his face when Bement shot him,[82] and Marco Villanueva who indicates that Hatcher was focused on his chest to pull out taser wires when Bement shot

---

[76] Pls. Exhibit B, Appx p. 8, Transcript p. 16 line 25 – p 17 line 16.
[77] *Id*. at Appx p. 11,  Transcript 8 lines 17-20.
[78] Pls. Ex. C at Appx p. 30,  Transcript p. 6 lines 2-11.
[79] *Id*. at Appx p. 18-25.
[80] *See generally* Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. pp. 1-51.
[81] Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 19.
[82] Pls' Exhibit B., Apx. P. 7, Transcript p. 14 line 20 – p. 15 line 11.

him.[83]  Further, many witnesses stated that Hatcher was not trying to attack the officers but was instead

simply trying to get away from the police officers.[84]

39.       Hatcher's actions immediately before getting shot are highly material because if Hatcher was bent

over, backing away, and wiping his eyes, then he did not display any threatening "Manis act" for Bement

to establish that his use of deadly force was objectively reasonable.[85]  In his Motion, Bement attempts to

compare his situation to that in *Harris v. Serpas*, where the officers were confronting a suicidal man who

was trying to stab the police officers with a knife.[86] Unlike this suicidal man who had a knife raised above

his head, Hatcher did not display a similar threatening "Manis Act" justifying the use of deadly force.

Instead, Hatcher was bent over, backing away, and wiping pepper spray out of his eyes when Bement shot

him.  Moreover, unlike *Harris v. Serpas*, where the suicidal man had been warned twice to drop his knife[87],

Bement did not warn Hatcher to drop the taser.[88]

40.       Thus, in viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find it

would have been unreasonable for Bement to shoot Hatcher four times.

          iii.       No prior warning was given to Hatcher.

41.       Third, there is a question of fact as to whether or not Hatcher was ever warned to drop the taser

before he was shot.  Officer Denson stated that she was about to pepper spray Hatcher again when Bement

shot without any warning at all.[89]  Even by Bement's own original account, he only shouted "Stop" at

Hatcher before shooting him.[90]

---

[83] Pls' Exhibit D., Apx. p. 30, Transcript p. 6.
[84] *Id.* at Apx. p. 15-16, Transcript p. 12, line 2 – p. 13, line 10; p. [   ], Transcript p. p. 5, line 19 – 24; at Apx p. 8, Transcript p. 17 line 23 – 18 line 3.
[85] *Cole* 68 F. Supp. 3d 628 ; *Manis*, 585 F.3d at 845.
[86] *Harris* 745 F.3d at 774.
[87] *Harris* 745 F.3d at 770.
[88] *Cole*,  68 F. Supp. 3d 628 (N.D. Tex. 2014) ("Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Cole never pointed a weapon at the Officers and was not given an opportunity to disarm himself before he was shot.").
[89] Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 17.
[90] Pls' Exhibit A., Apx. P. [   ] ("The female officer was backing up away from the suspect, and I shouted for the suspect to "Stop!") Not until over two years later, on February 18, 2015 did Bement add to his new affdidavit used for purposes of his Motion for Summary Judgment that he though he might have said more.  **Appx to Df.'s Mot. for**

42.      In *Cole v. Hunter*, the evidence suggested that Cole, who was in possession of a loaded gun, never pointed the gun at any of the officers and instead continuously directed the gun to his own head.  The court held that,

> Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Cole never pointed a weapon at the Officers and was not given an opportunity to disarm himself before he was shot. A jury could find that it would not have been reasonable for the Officers to believe that they were being threatened, and therefore they were not justified in using deadly force without first issuing an adequate warning.

43.      Similarly, had Hatcher been in possession of the taser, which Plaintiffs contend he was not, the evidence shows that Hatcher was not pointing the taser at anyone, nor was he given the opportunity to disarm himself.  Thus, Bement was not justified in using deadly force without first issuing adequate warning.

**D.      Summary Judgment should be denied because an objectively reasonable officer would have known his or her alleged conduct violated the law.**

44.      Under the second step of our qualified immunity analysis, a court asks "whether the right was clearly established at the time of the conduct."[91] "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[92]

45.      In the present case, it is undisputed that five other licensed and trained peace officers with guns were present on the scene, surrounding Hatcher, and standing within a few feet of Hatcher.  Each of the five officers standing with Bement, trained on when deadly force is reasonable, observed the situation as it happened and not in hindsight.  The five officers standing with Bement were engaged in effective non-deadly force, including one who was about to pepper spray Hatcher again[93], and two who had their non-

---

Summ. J. [Doc. 42] Apx. p. 45, ¶ 28 ("While I do not remember my exact words, I gave Hatcher commands to stop doing what he was doing.").
[91] *Lytle,* 560 F.3d at 410 (citing *Saucier,* 533 U.S. at 201).
[92] Id.
[93]  Appx to Df.'s Mot. for Summ. J. [Doc. 42] Apx. p. 17

lethal batons deployed.[94]   The five officers standing with Bement, some as close as three feet away, had their guns holstered when Bement not only drew his gun, but fired four times into the body of Hatcher.

46.     Thus, as clearly demonstrated by the actions of the five other officers present at the time Hatcher was shot, it would be clear to a reasonable officer that Bement's conduct was unlawful in the situation confronted.

## IV.   CONCLUSION

47.     The evidence presented above clearly establishes that the factual circumstances presented immediately before and during Hatcher's shooting are highly contested and material.  Presented in the light most favorable to Plaintiffs, the evidence clearly establish that Bement's acts were unreasonable.  Six armed officers surrounded Hatcher at the time of the shooting; not one of the other five officers even drew his or her weapon; one of the officers closest to Hatcher was about to approach Hatcher to pepper spray him again; two of the officer were planning to use non-deadly batons; Hatcher was given no warning that he was going to be shot; Hatcher did not possess a taser; and Hatcher was bent over, wiping his eyes and backing away when Bement repeatedly shot Hatcher four times.

48.     Thus, Plaintiffs have adequately identified genuine issues of material fact as to whether Bement's use of deadly force was objectively unreasonable under clearly established law.  Accordingly, Bement's Motion for Summary Judgment based on qualified immunity should be denied.

## PRAYER

For the reasons set forth above, Plaintiffs pray that this Court DENY Defendant Wesley Bement's Motion for Summary Judgment to grant such other relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

By: _____
Darren Wolf
Texas Bar No.  24072430
Darren@darrenwolf.com
Christianne Edlund

---

[94] *Id.* at Apx. p. 13, Apx. p. 10.

Texas Bar No. 24072083
christianne@darrenwolf.com
Law Office of Darren Wolf, P.C.
1701 North Market Street, Suite 210
Dallas, Texas  75202
Phone (214) 346-5355
Fax. (214) 346-5909
*Attorney for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

       I hereby certify that the foregoing instrument has been electronically filed with the Court using the CM/ECF system, and that notice of filing has been delivered to all counsel of record.

_____
Christianne Edlund