IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEFF HATCHER and MICHELLE HANSFORD, | § § § | |
| Plaintiffs, | § § | |
| V. | § § | No. 3:14-cv-432-M-BN |
| WESLEY BEMENT, | § § § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the undersigned United States magistrate judge for pretrial management pursuant to 28 U.S.C. § 636(b) and a standing order of reference from United States District Judge Barbara M. G. Lynn. The undersigned issues the following findings of fact, conclusions of law, and recommendation that the Court should deny Defendant Wesley Bement's motion for summary judgment on his affirmative defense of qualified immunity and grant Plaintiffs Jeff Hatcher and Michelle Hansford's motion for leave to amend their complaint.

**Background**

Factual Background

The family of decedent Jordan Hatcher brings this action alleging that Hatcher's Fourth Amendment right to be free from excessive force was violated in a deadly shooting that occurred in January 2013. The events leading up to that shooting began when Hatcher, suspected of shoplifting a video-game remote from a Target store in

-1-

Grand Prairie, Texas, struggled with a Grand Prairie Police Department ("GPPD") officer and then fled on foot.

Defendant, also a GPPD officer, testified through a sworn declaration that, while in his patrol car, he encountered Hatcher fleeing and also heard radio communications regarding Hatcher – that he had stolen property, assaulted people (including a GPPD officer), and may be armed with a knife (which did not turn out to be true). Further radio communications regarding Hatcher's whereabouts prompted Defendant to drive to a nearby campus of Tarrant County College ("TCC" or "TCCD"). There, Defendant and other police officers eventually surrounded Hatcher in a parking lot.

According to Defendant, because Hatcher had been noncompliant with other officers, Defendant drew his taser before he approached Hatcher. Defendant's first attempt to deploy the taser failed, and, in his second attempt, only one probe (or barb) struck Hatcher. In short, according to Defendant, the taser (in barb deployment mode) had no effect on Hatcher, which prompted Defendant to use the taser to deliver a drive stun directly to Hatcher, which also proved unsuccessful in restraining Hatcher.

Defendant testified that, after a direct physical struggle with Hatcher, during which TCCD Police Officer Shamika Denson deployed pepper spray in their immediate vicinity, Hatcher overpowered him and took away the taser. According to Defendant, Hatcher, armed with the taser, was moving toward Officer Denson when Defendant drew his firearm and warned Hatcher to stop. After which, according to Defendant, Hatcher turned toward Defendant, pointed the taser at him, and begin walking toward Defendant. Defendant then shot Hatcher four times, killing him.

While the facts presented above are drawn from Defendant's declaration submitted in support of his summary judgment motion, *see* Dkt. No. 62 at 39-46, Plaintiffs contend that Hatcher was not armed with Defendant's taser, that Hatcher was not moving toward Defendant or Officer Denson, and that Hatcher was not warned to stop before Defendant discharged his firearm.

Procedural Background

The procedural background of this action leading up to the Court's granting Plaintiffs leave to conduct discovery to uncover facts needed to rule on whether Defendant is entitled to qualified immunity is set out in the Court's April 3, 2015 memorandum opinion and order. *See Hatcher v. Bement*, No. 3:14-cv-432-M-BN, 2015 WL 1511106 (N.D. Tex. Apr. 3, 2015) [Dkt. No. 51]. After that decision, the parties worked cooperatively to facilitate Plaintiffs' requested discovery, after which Defendant re-filed his summary judgment motion. *See* Dkt. Nos. 60-64. Plaintiffs have filed a response in opposition, *see* Dkt. No. 67, and have requested leave to file an amended complaint, *see* Dkt. No. 68. Defendant has filed a reply in support of his summary judgment motion, *see* Dkt. No. 70, and has opposed Plaintiffs' request for leave to amend, *see* Dkt. No. 74.

The parties have also provided considerable briefing regarding Defendant's objection to the Court's consideration of certain evidence that Plaintiffs cite in opposition to the summary judgment motion. *See* Dkt. Nos. 72, 73, 75, 76, & 77. As to these objections, Plaintiffs also requested "that this Court defer considering the [summary judgment motion] and allow Plaintiffs time to obtain affidavits or

declarations or to take additional discovery pursuant to [Federal Rule of Civil Procedure] 56(d)." Dkt. No. 76 at 1.

While Plaintiffs' Rule 56(d) motion was not procedurally proper, the undersigned understood at least part of their request to mean that, to the extent that the Court agreed with Defendant that certain facts that Plaintiffs contend to be material to the issues before the Court are not properly supported or presented in an admissible form, *see, e.g.*, FED. R. CIV. P. 56(c)(2); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 191-92 (5th Cir. 1991), Plaintiffs would like an opportunity to properly support those facts. And, in light of Federal Rule of Civil Procedure 56(e)(1), the undersigned allowed the parties to file a supplemental response and a supplemental reply. *See* Dkt. No. 78; *see also* FED. R. CIV. P. 56 committee's note, 2010 Amendments, Subdivision (e) ("[S]ummary judgment cannot be granted by default ..., [particularly] when an attempted response fails to comply with Rule 56(c) requirements.... Before deciding on other possible action, subdivision (e)(1) recognizes that the court may afford an opportunity to properly support or address the fact. In many circumstances this opportunity will be the court's preferred first step."). Both sides have filed additional briefing, and Plaintiffs have supplemented the record. *See* Dkt. Nos. 79 & 80.

### Legal Standards

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (in turn

quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); some internal quotation marks omitted). This "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011); internal quotation marks omitted); *see also Mullenix*, 136 S. Ct. at 308 ("[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right'"(quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012))).

While review of a motion for summary judgment based on qualified immunity is accomplished in two steps, a court may conduct the required two-step examination in any order. *See Pearson*, 555 U.S. at 236; *see also Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014) (there is "discretion to decide which of the two steps of qualified immunity to address first").

Regardless of which prong is addressed first, a court must decide "whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a federal constitutional or statutory right." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014) (citing *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam); *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)), *reversed on other grounds*, 136 S. Ct. 305 (2015). Put differently, under the first prong, a court simply must decide "whether the plaintiff has alleged a violation of a constitutional right." *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008).

A court also must decide "whether the defendant's actions violated clearly

established statutory or constitutional rights of which a reasonable person would have known." *Flores*, 381 F.3d at 395. This second prong of the analysis requires a court to determine "whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident." *Charles*, 522 F.3d at 511. That is, even if a government official's conduct violates a clearly established right, the official remains entitled to immunity if his conduct was objectively reasonable. *See Davis v. McKinney*, 518 F.3d 304, 317 (5th Cir. 2008); *see also Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) ("The dispositive inquiry, we have said, is whether it would have been clear to a reasonable officer in the [defendants'] position that their conduct was unlawful in the situation they confronted." (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001); internal quotation marks and brackets omitted from original)).

To determine whether the law at the time of an incident was clearly established, even if the Court assumes that each right that a plaintiff asserts did apply in his case, each right must be defined at the appropriate level of specificity. While "'a case directly on point'" is not necessarily required to "conclud[e] that the law is clearly established, '[ ] existing precedent must have placed the statutory or constitutional question beyond debate.'" *Stanton*, 134 S. Ct. at 5 (quoting *al-Kidd*, 131 S.Ct. at 2085). The Court also may not "'define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *al-Kidd*, 131 S. Ct. at 2084); *accord Mullenix*, 136 S. Ct. at 309 ("The dispositive question is whether the violative nature of *particular* conduct is clearly

established." (citation and internal quotation marks omitted; emphasis in original)).

Essential to the "clearly-established inquiry is 'fair warning'"; thus, the Court is required to "ask 'not only whether courts have recognized the existence of a particular constitutional right, but also ... whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct.'" *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc) (respectively quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *McClendon v. City of Columbia*, 305 F.3d 314, 331 (5th Cir. 2002) (en banc) (per curiam)).

In sum,

> [w]hen deciding whether the right allegedly violated was "clearly established," the court asks whether the law so clearly and unambiguously prohibited the conduct that every reasonable official would understand that what he is doing violates the law. Answering in the affirmative requires the court to be able to point to controlling authority – or a robust consensus of persuasive authority – that defines the contours of the right in question with a high degree of particularity. This requirement establishes a high bar. When there is no controlling authority specifically prohibiting a defendant's conduct, the law is not clearly established for the purposes of defeating qualified immunity.

*Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (citing *Morgan*, 659 F.3d at 371-72; internal citations and quotation marks omitted).

Once a defendant invokes his entitlement to qualified immunity, "the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon*, 305 F.3d at 323; *see Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir. 1997) ("We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs." (internal quotation marks omitted));

*Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014) ("Once the defendant raises the qualified immunity defense, 'the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.'" (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008))); *see also Brooks v. City of West Point*, 18 F. Supp. 3d 790, 794 (N.D. Miss. 2014) ("The usual summary judgment burden of proof is altered somewhat in the case of a qualified immunity defense." (citing *Gates v. Tex. Dep't of Prot. & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008))).

The qualified immunity defense is appropriately resolved at the summary judgment stage when (1) a plaintiff has established that the defendant has engaged in the complained-of conduct or (2) the court "skip[s], for the moment, over ... still-contested matters to consider an issue that would moot their effect if proved." *Harlow*, 457 U.S. at 818; *see also Haverda v. Hays County*, 723 F.3d 586, 599 (5th Cir. 2013). "'If resolution of [qualified immunity] in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability ..., and if there are conflicting versions of his conduct, one of which would establish and the other defeat liability, then the case is inappropriate for summary judgment.'" *Haverda*, 723 F.3d at 599 (quoting *Barker v. Norman*, 651 F.2d 1107, 1123-24 (5th Cir. Unit A July 1981)).

Accordingly, a court's qualified immunity inquiry at the summary judgment stage requires that the court "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*,

391 F.3d 653, 655 (5th Cir. 2004); *see also Tolan*, 134 S. Ct. at 1863 ("[I]n ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *cf. Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) ("Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity 'must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal.'" (quoting *Gonzales v. Dallas Cnty., Tex.*, 249 F.3d 406, 411 (5th Cir. 2001))); *Fuentes v. Riggle*, 611 F. App'x 183, 189, 190 (5th Cir. 2015) (per curiam) (A court of appeals "can review the materiality of any factual disputes, but not their genuineness.... [D]eciding whose version of the facts must be accepted falls squarely within the realm of a dispute as to genuineness." (citations, quotation marks, and emphasis omitted)).

"Although summary judgment may be appropriate based on a plaintiff's inability to prove the facts essential to recovery, this has 'nothing to do with the qualified immunity defense.'" *Haverda*, 723 F.3d at 599 (quoting *Barker*, 651 F.2d at 1124)). "[I]mmunity ... [is] an entitlement distinct from the merits of the case." *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010) (citation and quotation marks omitted).

## Analysis

I.   <u>Qualified Immunity</u>

A.   <u>Summary judgment evidence</u>

In considering Defendant's entitlement to summary judgment on his qualified immunity affirmative defense, the Court bases its analysis on Plaintiffs' best version

of the facts. But that version may only be drawn from facts that are "reflected by proper summary judgment evidence." *Haggerty*, 391 F.3d at 655. The material facts here – what happened on January 24, 2013 leading up Defendant's shooting Jordan Hatcher – are principally drawn from witness statements submitted by the parties.[1] Defendant's witness statements (or reports), from officers present at the incident, are accompanied by sworn declarations from those officers. *See* Dkt. No. 62. Plaintiffs' witness statements are from recordings of interviews of civilian eyewitnesses conducted by either the Arlington Police Department or the TCCD Police Department. *See* Dkt. Nos. 67-1 & 79-1. These recordings, which Plaintiffs have also had transcribed, are from the police departments' records. But Plaintiffs have failed to provide sworn declarations from any of these eyewitness.

While Plaintiffs have provided business record affidavits from both police departments, *see* Dkt. No. 79-1 at 3-4 & 29-30, those affidavits do not overcome Defendant's objection to the Court's current consideration of the facts alleged in the civilian eyewitness' unsworn statements, on the ground that those statements are hearsay evidence. As the United States Court of Appeals for the Fifth Circuit has held in an analogous context, "[t]hird party statements included in a police report are not admissible under the public records exception to the hearsay rule." *Manis v. Lawson*, 585 F.3d 839, 844 n.3 (5th Cir. 2009) (citing 2 MCCORMICK ON EVIDENCE § 296 (6th ed.

---

[1] Plaintiffs also rely on an Arlington Police Department investigative report [Dkt. No. 79-1 at 6-13]. It does not appear that Defendant has raised an objection as to this report. In fact, Defendant relies on details in the report's narrative to support his version of the events.

2006), but then considering the statements "only because neither party objected to the admissibility of the statements in the [district court] proceedings"); *see Barnes v. Commerce & Indus. Ins. Co.*, Civ. A. No. 11-0041, 2013 WL 6118352, at *1 (W.D. La. Nov. 20, 2013) ("Witness statements within police reports are inadmissible hearsay if offered to prove the truth of the matter asserted." (collecting cases)); *see also Guardian Life Ins. Co. of Am. v. Bean*, No. SA:14-cv-604-DAE, 2015 WL 993454, at *3 (W.D. Tex. Feb. 4, 2015) ("When ruling on a summary judgment motion, a court may consider only admissible evidence. The Court notes that both pieces of evidence arguably suffer from hearsay or authentication issues. However, the Court may consider otherwise inadmissible evidence if neither party objects to it." (citations omitted)).

The Court afforded Plaintiffs an opportunity to obtain affidavits or declarations from the civilian eyewitnesses, *see* Dkt. No. 78 (citing FED. R. CIV. P. 56(e)(1) (providing that, "[i]f a party fails to properly support an assertion of fact," for example, "the court may" "give an opportunity to properly support or address the fact")), and Plaintiffs supplemented their summary judgment evidence, *see* Dkt. No. 80. But Plaintiffs' supplemental submission fails to correct the hearsay issue noted above, to which Plaintiffs were already on notice through Defendant's objections made prior to the Court's allowing Plaintiffs an opportunity to supplement their submission.

Accordingly, the undersigned has not considered the civilian eyewitness statements in the analysis below.

B.   <u>Fourth Amendment violation</u>

"In the Fifth Circuit, to succeed on an excessive force claim, the plaintiff bears

the burden of showing: '(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable.'" *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (quoting *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)). A court assesses the reasonableness of the force by examining

> the facts and circumstances of the particular case – the need for force determines how much force is constitutionally permissible. The court should consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (citations and internal quotation marks omitted).

And, "[u]nlike some areas of constitutional law, the question of when deadly force is appropriate – and the concomitant conclusion that deadly force is or is not excessive is well-established.... [T]he focus of the inquiry is 'the act that led [the officer] to discharge his weapon.'" *Reyes v. Bridgewater*, 362 F. App'x 403, 406 (5th Cir. 2010) (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) (holding that deadly force is not justified unless a suspect poses a risk of serious harm at that point in time); quoting *Manis*, 585 F.3d at 845); *see also Luna*, 773 F.3d at 722 ("In a case involving the shooting of a suspect, we have stated that the 'core issue' is 'whether the officer reasonably perceived an immediate threat.'" (quoting *Reyes*, 362 F. App'x at 408)).

But, while "[t]he intrusiveness of a seizure by means of deadly force is unmatched," *Garner*, 471 U.S. at 9, the use of force "must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."); *see also Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003) (The "[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others.").

Although Defendant's account of the incident is set out generally above, Plaintiffs' best version of the facts reflected by proper summary judgment evidence – which the Court is required to accept as true in this context, *see Haggerty*, 391 F.3d at 655 – comes in large part from Officer Denson's voluntary witness statement, which was submitted, along with her sworn declaration, by Defendant. *See* Dkt. No. 62 at 17-20.

> The suspect appeared combative by having his hands clenched in fists down by his sides and looked angry. He refused to obey the officers' commands to go to the ground. The suspect told officers very defiantly, "If you want me down, you got to get me down!"
>
> The suspect was standing in Lot E facing east and was surrounded by approximately 5 TCCD officers, including myself among the 5, and 2 GPPD officers. I thought we were all about to tackle the suspect him [sic], but no one did. We just surrounded the suspect. I did see one of the GPPD officers with his Taser out. He yelled to the suspect to "Get on the ground." The GPPD was about five feet or less away from the suspect when he shot his Taser cartridge at the suspect. Only one probe made it into the suspect and was visible in the lower area of his stomach. The other probe just bounced off the suspect and dangled to the ground.
>
> It was obvious the Taser failed and even the GPPD officer said, "Shit!" The officer started messing with the Taser and the other-GPPD

officer was telling him to do something but I could not hear what he said as other officers started yelling at the suspect. The officers started going around the suspect and I was expecting they were going to take him down. I yelled in a loud voice to the other officers, "Team! Take him down now!" But no one moved in to subdue him. I then took out my pepper spray and sprayed it directly into the suspect's face and eyes area. I know the pepper spray hit the suspect in his face as I was only 3 feet away when I sprayed him and I could see it on his face around his eyes and nose. The suspect closed his eyes momentarily. Then [TCCD Police] Sgt. Jefferies sprayed the suspect with his pepper spray.

The suspect then tried to walk slowly away from all of us. It appeared like he was squinting and had his head down and was attempting to wipe away the residue from his eyes. I was about to spray the suspect again when all the sudden, without any warning, or notice, [I] heard a gunshot come from my right and saw the suspect get hit in his upper left side. The suspect reacted by flinging his left arm backwards. I was so close I could see the blood coming out of the wound in his chest. It startled me so much that I started backing up. I looked towards my right to see who was firing and I saw a GPPD officer pointing his pistol in the direction of the suspect and me. The suspect seemed like he was starting to fall backwards in my direction. While I was backing up I heard two more shots being fired and I was thinking "Why is he still shooting?" as I was so close to the suspect. I was worried about getting shot. I backed up so quickly that I lost my balance and fell backwards to the ground.

In all, I think I heard 3-4 shots that were fired by the GPPD officer. The suspect fell backward on the concrete and came to rest on his back. I never saw the suspect move again after that.

Dkt. No. 62 at 19.

Through her declaration submitted in support of Defendant's summary judgment motion, Officer Denson further testifies (1) that Defendant "was close enough to [Hatcher] that [Defendant] could have been affected by the pepper spray" but that Hatcher "did not appear to be incapacitated by the pepper spray" and (2) that she "did not see [Hatcher] grab [Defendant's t]aser" but "knew [Hatcher] still had possession of the ... taser" "[w]hen shots were fired." *Id.* at 17.

Further, Defendant's original sworn account of the events leading up to his

shooting Hatcher, given January 29, 2013, contradicts his summary judgment declaration (provided some 23 months later) and also Officer Denson's account in at least one material respect – whether Hatcher was attacking Officer Denson prior to Defendant's discharging his firearm. In his original account, Defendant relates that, after he was affected by the pepper spray, after which Hatcher "ripped the Taser from [Defendant's] hands," Hatcher, armed with the taser, then

> began moving toward the female officer [Officer Denson]. I drew my pistol as the suspect began approaching the female officer while pointing the Taser at her. The female officer was backing up away from the suspect, and I shouted for the suspect to "Stop!" The suspect was now attacking the female officer, and I was in fear that he would injure her and take her firearm.

Dkt. No. 79-1 at 4. No other accounts support Defendant's original assertion that Hatcher was "attacking" Officer Denson. *Cf. Watson v. Bryant*, 532 F. App'x 453, 459-60 (5th Cir. 2013) (per curiam) ("None of the evidence here calls into question any relevant aspect of Bryant's testimony, which has been materially consistent from the time he filed his initial report through his deposition. Ms. Watson provides no evidence to support her skepticism of Bryant's story, and at the summary judgment stage we require evidence – not absolute proof, but not mere allegations either." (citations, footnotes, brackets, and internal quotation marks omitted)).

Plaintiffs also contend that Hatcher was not armed with the taser. Among the proper summary judgment evidence, Plaintiffs point to Officer Denson's sworn statements. While her original report does not mention that Hatcher was armed, her summary judgment declaration muddles this issue somewhat. Through that

-15-

declaration, she states that she "did not see" Hatcher grab the taser, then speculates that, "if [Hatcher] had taken the Taser from [Defendant], ... [he] could pose an immediate risk of serious bodily injury to the Officers in the immediate vicinity," but then declares that she "knew [Hatcher] still had possession of the ... taser" "[w]hen shots were fired." Dkt. No. 62 at 17. Plaintiffs also infer that, given Officer Denson's proximity to Hatcher at the time of the shooting ("I was so close I could see the blood coming out of the wound in his chest"), if Hatcher was armed with the taser, Officer Denson would have said so in her original statement.

In addition to Officer Denson's account, Plaintiffs point to the Arlington Police Department investigative report, which provides that the taser was discovered "approximately 4 feet South of [Hatcher]," Dkt. No. 79-1 at 8, and contend that this placement of the taser is not consistent with Defendant's account that Hatcher "dropped the Taser, and he fell to the ground," Dkt. No. 79-1 at 4.

Plaintiffs further contend that Defendant failed to warn Hatcher prior to discharging his weapon. Although this point is also contested, Officer Denson's account that, "all the sudden, without any warning, or notice, [I] heard a gunshot come from my right and saw the suspect get hit in his upper left side," Dkt. No. 62 at 19, supports Plaintiffs' contention.

At this stage, the Court must accept Plaintiffs' best version of the facts supported by summary judgment evidence and draw all justifiable inferences in their favor. *See, e.g.*, *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013) (observing that "factual controversies [are resolved] in favor of the nonmoving party,

but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts" (citation omitted)). In doing so, the facts plainly material to "the critical inquiry" here – "whether a reasonable officer in [Defendant's] position reasonably perceived an imminent threat of bodily harm," *Glover v. Pailet*, Civ. A. No. 13-2984, 2015 WL 2250092, at *11 (E.D. La. May 13, 2015) (citing *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009); *Thompson v. Mercer*, 762 F.3d 433 (5th Cir. 2014)) – are that, at the moment deadly force was used, Hatcher was not armed and was not given a verbal warning but was, instead, after being pepper sprayed, trying "to walk slowly away from all of [the officers]," "squinting" with his "head down," and "attempting to wipe away the residue from his eyes."

Although it is not generally disputed that Hatcher shoplifted, fled, resisted arrest, and struggled with Defendant, in the Fifth Circuit, "'[t]he excessive force inquiry is confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting.'" *Harris*, 745 F.3d at 772 (quoting *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)); *see, e.g., id.* at 773 ("When looking at the 'moment of the threat' that resulted in Officer McGee's use of deadly force, it is clear from the taser video that Mr. Harris was standing up out of bed and had raised the knife above his head at the time the shots were fired. Accordingly, the district court properly held that under these circumstances, the officers reasonably feared for their safety at the moment of the fatal shooting."); *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011) ("At the time of the shooting, Scott was engaged in an armed struggle with the officers, and therefore each of the officers had a reasonable

belief that Scott posed an imminent risk of serious harm to the officers. We need not look at any other moment in time." (citing *Bazan*)); *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1134-35 (5th Cir. 2014) ("It is undisputed that, at the time Rice was shot, he had exited his truck, was walking toward the door into his house, and as discussed above, had a gun in his hand. The material fact here is that Rice was armed and moving toward the officers." (relying on *Rockwell*)).

Accepting as true Plaintiffs' version of the facts, at the time that he was shot, Hatcher was neither armed nor moving toward Defendant, Officer Denson, or any other officer but rather trying to walk slowly away from them. Therefore, focusing on "the 'moment of the threat' that resulted in [the] use of deadly force," *Harris*, 745 F.3d at 773, from Plaintiffs' perspective, it was not objectively reasonable to use deadly force against Jordan Hatcher, *see Reyes*, 362 F. App'x at 409 ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others. Here, the facts are unclear; was there such an immediate threat? [Defendant's] version of the facts would say 'yes,' while [Plaintiffs'] versions would say 'no.' The case presented here is ... one where the facts are not clearly established. As such, summary judgment [is] improper."); *cf. Rocha v. Schroeder*, 283 F. App'x 305, 306 (5th Cir. 2008) (per curiam) (finding that, there, the decedent's "violent attack on police officers [did not result] in the grant of qualified immunity" in part because, "despite the need for split-second decisionmaking, it is possible a 'reasonable' officer would have known that a taser shot would not be lethal to [the other officer] and could have noticed that [decedent] actually had no weapon in his hands").

Before turning to the other qualified-immunity prong – the clearly-established inquiry – because of the cases that Defendant contends are most relevant and support his right to summary judgment on his qualified immunity affirmative defense, *Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997); *Davenport v. Causey*, 521 F.3d 544 (6th Cir. 2008); and *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014) – the undersigned pauses to distinguish those cases. In all three cases, the courts, at summary judgment, had the benefit of a video of the incident. *See Colston*, 130 F.3d at 98, 99 ("A video recorder mounted on Barnhart's patrol unit was operating from the time Barnhart stopped his vehicle. The incident described above was captured on videotape, which is part of the record.... At the time Barnhart fired his weapon at Colston, the video tape and the remaining summary judgment evidence establish the [material facts]."); *Davenport*, 521 F.3d at 547 ("The facts in the record come from the deposition testimonies of Officer Causey and Officer Larry Pugh, and from a video produced by Officer Causey's vehicle's dash camera, which started when Officer Causey activated the lights on his marked police car and which displays, without sound, all but three seconds of Officer Causey's, Officer Pugh's, and Mr. Davenport's pertinent movements after the traffic stop was initiated." (footnote omitted)); *Harris*, 745 F.3d at 770 ("The officers carried two tasers that included small camera devices, which recorded audio and video.").

As the Fifth Circuit noted in *Harris*, "when there is video evidence available in the record, the court is not bound to adopt the nonmoving party's version of the facts if it is contradicted by the record, but rather should 'view[ ] the facts in the light

depicted by the videotape.'" 745 F.2d at 771 (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007); citing *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.")). And, in *Davenport*, even after the Sixth Circuit conceded "to the plaintiffs, [that a certain] off-camera blow did not occur," the video still showed that, "[a]t the time he was shot, Mr. Davenport was preparing to strike Officer Pugh on the top of his head with his first for a forth time." 521 F.2d at 553-54; *compare id.*, *with* Dkt. No. 62 at 19 ("[Hatcher] then tried to walk slowly away from all of us. It appeared like he was squinting and had his head down and was attempting to wipe away the residue from his eyes. [Officer Denson] was about to spray [Hatcher] again when all the sudden, without any warning, or notice, [she] heard a gunshot come from [her] right and saw [Hatcher] get hit in his upper left side.").

Without videotape evidence, as explained above, the Court, at this stage, is bound to accept as true Plaintiffs' best version of the facts supported by summary judgment evidence, even if Defendant is not prepared to concede that version of the facts. This universe of facts drives, as it must, the undersigned's Fourth Amendment finding here. *Cf. O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ('[G]iven the difficult problem posed by a suit for the use of deadly force, in which 'the witness most likely to contradict [the police officer's] story – the person shot dead – is unable to testify[,] .... the court may not simply accept what may be a self-serving account by the police officer.' Rather, the court must also consider 'circumstantial

evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.'" (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994))) (cited by the Fifth Circuit in *Watson*, 532 F. App'x at 459-60).

    C.    <u>Clearly established law</u>

Under this prong of the qualified immunity analysis, a court's "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (in turn quoting *Saucier*, 533 U.S. at 201); some internal quotation marks omitted). "Such specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* (quoting *Saucier*, 533 U.S. at 205).

*Brosseau* and Fifth Circuit precedent relying on *Brosseau* "do not, however, require ... a case with exactly the same facts finding a constitutional violation." *Reyes*, 362 F. App'x at 408 (citing *Ontiveros*, 564 F.3d at 383 n.1 (in turn citing *Brosseau*, 543 U.S. at 199-200 & n.4)). "Instead, they require that the law clearly set parameters under which an objectively reasonable officer would know what is permissible and what is excessive." *Id.* at 408-09 (citing *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) ("The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and

the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" (quoting *Hope*, 536 U.S. at 740)); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) ("[T]he issue is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate [the Constitution].")).

"[T]he Fourth Amendment right to be free from excessive force during a seizure is clearly established." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citing *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (per curiam)). That is, at the time of January 2013 shooting here,

> it was clearly established that an arresting officer could "use some degree of physical coercion or threat" to make the arrest but "the permissible degree of force depend[ed] on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee."

*Banks v. Gammon*, No. 3:08-cv-474-K-BH, 2010 WL 2812863, at *6 (N.D. Tex. June 10, 2010), *rec. adopted*, 2010 WL 2812912 (N.D. Tex. July 13, 2010) (quoting *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (in turn relying on *Saucier*, 533 U.S. at 208; *Graham*, 490 U.S. at 395)). "It was also clearly established that using deadly force was only justified by a reasonable belief that the officer or the public was in imminent danger." *Id.* (citing *Flores*, 381 F.3d at 401 (holding that in 2002, a reasonable police officer was on notice "that using force carrying with it a substantial risk of causing death or serious bodily harm is deadly force" and was "also on notice that deadly force would only be justified by a reasonable belief that he or the public was in imminent

danger" (citation and internal quotation marks omitted))).

Turning back to Plaintiffs' best version of the facts, *see Tolan*, 134 S. Ct. at 1866 (emphasizing that, when considering summary judgment on qualified immunity, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment"), a reasonable officer was on notice that it is objectively unreasonable to use deadly force against an arrestee who is not armed but is, at the time deadly force is employed, instead reacting to being pepper sprayed by trying "to walk slowly away from all of [the officers]," "squinting" with his "head down," and "attempting to wipe away the residue from his eyes," *see Reyes*, 362 F. App'x at 409 (discussing, similarly, a case in which the law is clearly established but "the facts are not").

## II.   Leave to Amend

"[T]he grant of leave to amend the pleadings pursuant to [Federal Rule of Civil Procure 15(a)] is within the discretion of the trial court." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971). And Rule 15(a)(2) requires that leave to amend be granted freely "when justice so requires." FED. R. CIV. P. 15(a)(2). But granting leave to amend "is by no means automatic." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) (quoting *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. Unit A July 1981)).

In deciding whether to grant leave to amend, the Court may consider factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party, and futility of amendment." *Id.* (citing cases). And "a district court may refuse leave to amend if the filing of the amended complaint would be futile, i.e., if the complaint as amended would be subject to dismissal." *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014) (quoting *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196, 208 (5th Cir. 2009)) (internal quotation marks omitted). But this Court's

> almost unvarying practice when futility is raised is to address the merits of the claim or defense in the context of a Rule 12(b)(6) or Rule 56 motion. The court only infrequently considers the merits of new causes of action in the context of Rule 15(a). The court prefers instead to do so in the context of a Rule 12(b)(6) or Rule 56 motion, where the procedural safeguards are surer.

*Reneker v. Offill*, No. 3:08-cv-1394-D, 2011 WL 1427661, at *1 (N.D. Tex. Apr. 13, 2011); *see also Lefall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994) ("recogniz[ing]" that, in addition to futility, untimeliness is a "valid reason" that is substantial enough to deny leave to amend (citing *Avatar Exploration, Inc. v. Chevron, U.S.A., Inc.*, 933 F.2d 314, 320-21 (5th Cir. 1991))).

Plaintiffs state that they seek leave to amend the operative complaint to conform the complaint to new evidence that they have uncovered, the most significant of which (based on Defendant's opposition) is evidence that Hatcher did not possess Defendant's taser at the time he was shot. *See* Dkt. No. 68. Defendant's oppose leave to amend on the grounds that the evidence cited is not newly discovered, that Plaintiffs have waited too long – given the "considerable time and resources" that "the Court and Officer Bement have expended" to address "the allegations in the Original and First Amended Complaint" – and that Defendant will be prejudiced by the deletion of what he

considers to be a judicial admission (that Hatcher possessed the taser). Dkt. 74 at 8.

Leave to amend should be granted because, in considering Defendant's qualified immunity summary judgment motion, Defendant has addressed – and the undersigned has considered – evidence that Plaintiffs contend support their position that Hatcher did not possess Defendant's taser at the time he was shot. Thus, no prejudice seems apparent. Defendant is also not prejudiced by granting leave to amend at this point in the litigation because the limited discovery so far allowed has been confined to addressing the qualified immunity affirmative defense. That is, to this point, resolution of that issue has guided the Court's consideration of this lawsuit. Accordingly, the timing of the requested amendment is not similar to a request for leave to amend made after a defendant has moved for summary judgment on the merits.

## Recommendation

The Court should deny Defendant's motion for summary judgment on his affirmative defense of qualified immunity [Dkt. No. 60], grant Plaintiffs' motion for leave to amend their complaint [Dkt. No. 68], and direct the Clerk of Court to docket Dkt. No. 68-1 as the second amended complaint.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: February 2, 2016

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE